# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

DINA BURRIS,

         Plaintiff,

    v.                                        Case No. 08-CV-322

AURORA HEALTH CARE LONG TERM DISABILITY PLAN,

         Defendant.

_____

## ORDER

On April 17, 2008, plaintiff Dina Burris filed suit against defendant Aurora Health Care Long Term Disability Plan ("the Plan"), alleging she was wrongfully denied long term disability ("LTD") benefits under the Plan in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, *et seq.* The Plan maintained that it was justified in denying plaintiff LTD benefits because she failed to produce sufficient evidence to show that she was disabled from performing any occupation. Accordingly, the parties filed cross-motions for summary judgment which are now briefed and ready for decision. The court, upon review of the arguments and evidence presented in this case, finds that plaintiff is entitled to summary judgment because the decision to deny plaintiff LTD benefits was arbitrary and capricious.

## BACKGROUND

Burris was employed by Aurora Health Care ("Aurora") as an Administrative Assistant I, commencing June 3, 2002. (Stip. Facts [Dkt. 35] ¶ 7). The

"mental/physical requirements" of her job were: 1) "ability to sit, walk, stand, bend, and lift frequently throughout the workday"; 2) "[o]ccasionally lift items weighing up to 20 lbs."; 3) have functional speech, vision, and hearing"; 4) "[o]perate all equipment necessary to perform the job"; and 5) be "[e]xposed to a normal office environment." (Id.).

On August 20, 2004, Burris's treating physician, Dr. Stephen Hinkle, a rheumatologist, advised her to cease working because of her medical condition, diagnosed as deQuervain's Tenosynovitis[1] and polyarthritis. (Id. ¶ 8). On that same day, Burris filed for short-term disability benefits. (Id.) She did not return to work after that date. (Id.). On October 21, 2004, she applied for LTD benefits, under the Plan, which were approved on November 23, 2004. (Id. ¶ 14).

Throughout 2005, Burris continued seeing Dr. Hinkle for her condition, and he, from time to time upon request, completed, and submitted to Matrix Absence Management (the Plan's designated claim administrator), reports as to Burris's condition. (Id. ¶¶ 15-21). Dr. Hinkle opined that Burris was unable to work because of tendinitis in her right hand, and that she also exhibited "objective tender points of fibromyalgia." (Id. ¶18). However, after reviewing Burris's LTD claim file, and speaking with Dr. Hinkle, a Matrix Nurse Case Manager concluded that "there continues to be no objective medical [evidence] to support [Burris] being continuously unable to perform the function of her job." (Id. ¶ 19). Thus, on

---

[1] DeQuervain's is a painful inflammation of tendons in the thumb.

February 10, 2006, Matrix sent Dr. Hinkle a letter stating that it was evaluating whether Burris continued to be eligible for LTD benefits. (Id. ¶ 22).

The terms of the Plan are set out in the Long Term Disability Plan Summary Plan Description ("SPD").[2] (*See* Wilson Aff., Dkt. #18, Ex. 1).[3] Among the terms of the SPD is a requirement that LTD benefit recipients apply for Social Security benefits. (AHC 0019). After an initial denial of Social Security benefits, Burris requested a hearing, which was held on March 20, 2006. (Stip. Facts ¶ 24). On June 20, 2006, the Administrative Law Judge who had heard Burris's case issued a decision in which she determined that Burris was entitled to Social Security disability insurance benefits. (Id. ¶ 24). Upon receipt of her Social Security award, Burris tendered to the Plan a check in the amount of $15,060, per the terms of the SPD's offset provision. (Id. ¶ 28).

The SPD distinguishes between benefits paid out because of a claimant's inability to perform her own job ("own occupation"), and benefits paid out because of a claimant's inability to perform any job ("any occupation"). Under the SPD, recipients are only entitled to collect "own occupation" LTD benefits up to a maximum of twenty-four months. (AHC 0006). To continue receiving LTD benefits

---

[2] For the sake of clarity, the court specifies that it will use the moniker "the Plan" to refer to Aurora Health Care's Long Term Disability Plan as an entity, and the court will use the term "the SPD" when referring to the actual document (as in the contractual language) that constitutes the terms and provisions of the Plan. (*See* AHC 0005 ("Th[e] [SPD] is also the *plan* document.")).

[3] The entirety of the SPD may be found at Docket #18, Ex. 1. The pages of the SPD are numbered AHC 0001 - AHC 0028. All citations to the SPD will simply identify the relevant page number utilizing this internal numbering format.

Case 2:08-cv-00322-JPS   Filed 03/18/10   Page 3 of 34   Document 42

beyond this twenty-four month cutoff, a claimant must show that her disability prevents her from performing any occupation for which she would be suited by education, training, or experience. (Id.).

On July 7, 2006, Matrix informed Burris that as of November 18, 2006, Burris would have received twenty-four months of LTD benefits, thus Matrix was beginning its evaluation of whether Burris was eligible to continue receiving benefits, in excess of twenty-four months, under the "any occupation" provision. (Stip. Facts ¶ 26). In response, Dr. Hinkle submitted a functionality assessment to Matrix opining that Burris was incapable of "performing full time work that is primarily seated in nature, with an allowance for the flexibility to stand when needed and requiring lifting up to 10 pounds." (Id. ¶ 27). Dr. Hinkle further stated that he did not anticipate any improvement in Burris's condition, and he, Dr. Hinkle, detailed the specific restrictions and limitations that prevented her from returning to work.[4] (Id. ¶ 27).

On September 14, 2007, Matrix sought approval from the Plan for an independent medical examination ("IME") of Burris. (Id. ¶ 31). The Plan gave its approval on September 19, 2006, and the IME was conducted by Dr. David Goodman on October 27, 2006. (Id. ¶¶ 33, 38). Dr. Goodman reviewed Burris's medical documentation and conducted a physical examination of Burris. (Id. ¶ 38).

Dr. Goodman submitted his IME report to Matrix on November 13, 2006. (Id.) In his report, Dr. Goodman stated that he found no basis for a determination that

_____

[4] *See* infra page 20-21.

Case 2:08-cv-00322-JPS   Filed 03/18/10   Page 4 of 34   Document 42

Burris met the criteria necessary for "any occupation" LTD benefits. (Id.). On November 22, 2006, Matrix informed Burris that it was denying her claim for "any occupation" LTD benefits. (Id. ¶ 39). On May 14, 2007, Burris, through her attorney, appealed the denial of her claim. (Id. ¶ 42). On August 27, 2007, Marvin Mitchell, a Registered Nurse and Matrix Medical Management Manager, reviewed Burris's claim and recommended that her appeal be denied. (Id. ¶ 44). By letter dated September 25, 2007, Matrix informed Burris of the denial of her appeal. (Id. ¶ 45). Burris, thereafter, filed the instant case seeking review of Matrix's denial of her claim.

## ANALYSIS

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine

issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II.    STANDARD OF REVIEW

Before examining the Plan's denial of plaintiff's LTD benefits, the court must determine the standard of review by which that decision should be evaluated. "[A] denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan administrator [or fiduciary] "is given discretion to interpret the provisions of the plan, then [their] decisions are reviewed using the arbitrary and capricious standard." *Wetzler v. Illinois CPA Soc. & Foundation Retirement Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009).

The language of the SPD in the instant case states: "The *claim administrator* has full discretionary authority to make decisions on eligibility for benefits under this *plan* and to construe the terms of the *plan* for this purpose and will do so without regard to any possible conflicting interests of Aurora Health Care." (AHC 0021). Such language clearly confers upon Matrix (the claim administrator) discretion to interpret the provisions of the SPD, thus entitling Matrix's decisions, adopted by the Plan, to arbitrary and capricious review.

Case 2:08-cv-00322-JPS    Filed 03/18/10    Page 6 of 34    Document 42

Plaintiff argues that pursuant to the SPD, a party that appeals an initial decision by Matrix is entitled to de novo review by the plan administrator. (Pl. Br. Supp. Mot. S.J. at 4). The plan administrator, as distinguished from the claim administrator (Matrix), is the Vice President of Compensation and Benefits for Aurora. (AHC 0025). Plaintiff argues that because only the claim administrator, and not the plan administrator, is granted discretionary authority pursuant to the SPD, and because the plan administrator, and not the claim administrator, makes the final decision on appealed claims, then that means that final decisions on appealed claims are not entitled to arbitrary and capricious review, but should be reviewed de novo by this court. (Pl. Br. Supp. Mot. S.J. at 4).

The problem with plaintiff's argument is that it is not supported by the facts. Despite plaintiff's arguments to the contrary, the SPD does not state that appealed decisions will be reviewed and decided by the Plan Administrator.[5] The only basis for plaintiff's argument is that, according to a document from the Plan titled "Claim Review Procedure," the Plan Administrator will review an appealed claim and such review shall be de novo. (Aff. Martin, Ex. D at "AUR-BUR 10166") The reason this does not support plaintiff's argument is because the "Claim Review Procedure"

---

[5] Plaintiff cites AHC 0020 as the source for its argument that the plan administrator reviews appealed claims. AHC 0020 supports no such proposition; rather, AHC 0020 indicates that the claim administrator reviews appealed decisions.

document is not part of the SPD.[6]  Plaintiff has not argued that the "Claim Review Procedure" document is parol evidence that needs to be examined to interpret an ambiguity in the SPD, nor that the document is integrated into the SPD.  Accordingly, the court is obliged to find that Matrix's decision, as adopted by the Plan, is entitled to the deferential arbitrary and capricious standard of review.

## III.    ARBITRARY AND CAPRICIOUS DECISION

Plaintiff posits that there are four grounds on which the court should find that Matrix's decision was arbitrary and capricious.  First, Burris argues that it was impermissible for the Plan to require her to seek Social Security benefits, use those benefits to offset its own payments, and then for Matrix to fail to give due consideration to the Social Security Administration's disability determination.  Second, plaintiff argues that the Plan breached its obligation to independently review, de novo, Matrix's disability determination.  Third, plaintiff argues that Matrix failed to obtain a medical opinion from an individual with "appropriate training and experience in the field of medicine involved in the denial of benefits," as the SPD states that it will.  Fourth, plaintiff argues that Matrix unjustifiably repudiated its prior

---

[6] The Introduction of the Summary Plan Description states "This booklet is also the *plan* document." (AHC 0005).  The "Claim Review Procedure" document does not appear in the SPD.

The Plan argues that plaintiff's argument fails because the "Claim Review Procedure" document is clearly referring to Matrix when it refers to the plan administrator.  This argument is not convincing though.  The document appears to be referring to Matrix as the plan administrator because it states: "You should request a review by writing to: Director/Disability Practice Leader, Plan Administrator, Matrix Absence Management, P.O. Box 11035, San Jose, CA 95103."  However, as much as that supports defendant's argument, the line in the document that states: "[t]he Plan Administrator will review Matrix's decision" supports plaintiff's argument.  Ultimately, the Claim Review Procedure is ambiguous as to what entity it is referring to when it refers to the plan administrator.  This ambiguity does not affect the contractual language of the SPD though, as the "Claim Review Procedure" document is merely an ancillary document.

-8-

determination that plaintiff's conditions constituted a compensable disability. Fifth, though not at all well developed, plaintiff also argues that the rationale given by Matrix for denial of "any occupation" benefits was an arbitrary and capricious rationale.

In conducting its examination of the parties' cross-motions for summary judgment, the court is to consider each of the various case-specific factors, weigh them together, and determine the lawfulness of Matrix's denial of Burris's claim. *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2351 (2008). Thus, the court will proceed by considering each of the factors individually. Then the court will consider the factors in the aggregate to determine whether Matrix's decision could fairly be describe as "arbitrary and capricious."

A.      **Disregard for Burris's Award of Social Security Benefits**

Plaintiff asserts that Matrix's denial of benefits was arbitrary and capricious, at least in part, because the Plan required that she apply for Social Security benefits, used her Social Security award to offset its own costs, and then Matrix failed to adequately consider her Social Security disability determination when making its finding. Plaintiff relies heavily on *Glenn v. Metlife*, 461 F.3d, 660 (6th Cir. 2006) (*"Glenn I"*) and *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008) (*"Glenn II"*) as support for this argument. However, the *Glenn* cases are significantly distinguishable from the instant case.

In *Glenn I*, the Sixth Circuit Court of Appeals reversed the district court's grant of summary judgment to the defendant insurer, MetLife. 461 F.3d at 662. In finding that MetLife's denial of benefits was arbitrary and capricious, the court of appeals focused on the fact that MetLife "acted under a conflict of interest and also in unacknowledged conflict with the determination of disability by the Social Security Administration." *Id.* at 676. The court of appeals also took issue with the fact that MetLife offered no explanation for crediting a brief report by one of Glenn's doctors, while overlooking more detailed reports from the same doctor. *Id.* This combination of factors led to the court of appeals' reversal. *Id.*

A significant difference between the *Glenn* cases and the instant case lies in the fact that MetLife both decided an employee's eligibility for benefits under the plan, and paid those benefits, *Id.* at 666, whereas in the instant case the Plan pays out benefits, but delegates to Matrix, an independent fiduciary, the role of deciding which employees are eligible for benefits.[7] The significance of the existence of a conflict of interest in *Glenn I*, is highlighted in *Glenn II*, where the Supreme Court states that the course of events regarding Glenn's Social Security benefits, though important it its own right, also justified the court of appeals giving more weight to the

---

[7] Plaintiff rejects this characterization of the way the Plan in the instant case works, and instead argues that the Plan independently reviews Matrix's determinations. The court has already refuted this argument in its discussion of the applicable standard of review. Plaintiff's basis for arguing that the Plan is required to independently review Matrix's disability determinations is not grounded in the SPD.

Another significant difference between the *Glenn* cases and the instant case is the fact that there is no instance in the instant case of Matrix crediting one report by Burris's doctor while ignoring the remainder of his reports.

-10-

conflict of interest. Where such a conflict of interest is predominantly absent, such as in the instant case,[8] obviously the course of events regarding Social Security benefits is less of a factor than it was in the *Glenn* cases. *Ladd v. ITT Corp*, 148, F.3d 753, 756 (7th Cir. 1998) (describing a sequence of events similar to the sequence in *Glenn I* and the instant case, as "cast[ing] doubt on the adequacy of [the plan's] evaluation of [the plaintiff's] claim" though "not provid[ing] an independent basis for rejecting that evaluation."). Thus, it is clear that the Plan's actions regarding Social Security benefits are a factor to consider, but are not dispositive.

The fact that Matrix articulated a reason for disregarding Burris's Social Security disability award does negate a portion of the weight the court would otherwise accord to this factor. See *Ladd*, 148 F.3d at 756 (stating that if the Independent Medical Examiner had given reasons for disagreeing with the ALJ's Social Security Award, the court of appeals would have been constrained to affirm the insurance plan's decision). Matrix explained that the Social Security determination focused on factors such as Burris's advancing age, high school education, her combination of impairments and chronic pain, and that the criteria for awarding Social Security benefits was "substantially different" from the criteria under the Plan. (Stip. Facts ¶ 45). However, this explanation is clearly little more than perfunctory. Given that the Plan looks to determine whether a claimant can perform

---

[8] While Matrix may not be absolutely free of conflicting interests – for certainly Matrix is aware that if it is too liberal in awarding benefits, its business relationship with the Plan could be threatened – its conflicts are substantially less than those under which MetLife was operating.

any occupation for which they are suited by *education*, training, or *experience*, it is clear that there is significant overlap between the factors the ALJ considered, and the factors that Matrix was to consider.

## B.    The Plan's Failure to Review, De Novo, Matrix's Denial of Benefits

Plaintiff also argues that the Plan breached its obligation to independently review, de novo, Matrix's disability determination.   The Plan is obligated, according to 29 C.F.R. § 2560.503-1(h)(3)(ii), to:

> Provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual[.]

Id.  The facts indicate that this requirement was complied with, (Stip. Facts ¶¶ 39, 45), and plaintiff does not argue otherwise.   Rather, plaintiff argues that the Plan failed to comply with its contractual obligation to review Matrix's decision, de novo. As the court has already determined, no such contractual obligation exists.

## C.    Failure to Utilize an Appropriately Trained and Experienced Individual

Plaintiff criticizes Matrix's failure to use a rheumatologist to conduct the independent medical examination.  The IME was conducted by Dr. Goodman, who is Board Certified in Occupation Medicine and a Certified Independent Medical Examiner.  Plaintiff argues that because of the types of impairments Burris was claiming, it was incumbent upon Matrix to ensure that the IME was conducted by a rheumatologist.  It is plaintiff's position that Matrix's failure to do so violated 29

Case 2:08-cv-00322-JPS   Filed 03/18/10   Page 12 of 34   Document 42

C.F.R. § 2560.503-1(h)(3)(ii), which requires the fiduciary to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." Id.

The only case plaintiff cites for support of her position is *Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp. 2d 980, (N.D. Ill. 2003) in which the district court faulted the insurance company for consulting only in-house doctors, none of whom appeared, based on the evidence of record, to have had any expertise in either fibromyalgia or pain management. *Id.* at 995. However, the fact that Dr. Goodman was not a rheumatologist does not mean that he has no experience with the conditions being claimed by plaintiff. His credentials present a professional capable of reviewing the records of other specialists, examining Burris, and making an informed decision. *See Larque v. SBC Communications Inc. Disability Income Plan, Core, Inc.*, WL 3447740 at 6 n.13 (W.D. Tex. 2005) (holding that it was not arbitrary and capricious for administrator to rely on review by a medical doctor who was not a specialist in fields of chronic pain, neck injuries, or carpal tunnel - as were plaintiff's treating physicians). Defendant argues that this is especially true given the fact that fibromyalgia was not Burris's only complaint. Defendant cites *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607-08 (7th Cir. 2007) for the proposition that a rheumatologist is unnecessary when a claimant is relying on several claims, only one of which is fibromyalgia. Defendant's position may be correct, but *Mote* offers little support for that position. The claimant in *Mote* complained of fibromyalgia, chronic back pain,

-13-

migraine headaches and irritable bowel syndrome. *Id.* at 608. Thus, Mote sought disability benefits premised, at least in part, on conditions for which a rheumatologist would have no specialized knowledge. In the instant case, all of the conditions of which Burris complained – DeQuervain's tenosynovitis, fibromyalgia, lupus, chronic pain syndrome, and Osteoarthritis – implicate rheumatology.

However, the court is not to lose sight of the forest for the trees. Clearly, use of a rheumatologist would have been best. Matrix was aware of this, as evidenced by the fact that it sought a rheumatologist to conduct the IME. (Stip. Facts ¶ 31). The Plan authorized the requested IME with a rheumatologist. (Id. ¶ 33). Unfortunately, the agency used by Matrix, Doctor Experts, Inc., informed Matrix that there were "no rheumatologists in the Wisconsin area that will do an IME." (Id. ¶ 34). Doctor Experts, Inc., notified Matrix that Dr. Goodman was the only physician in the area that could perform the IME. (Id. ¶ 35). To overturn Matrix's decision for not doing something they could not do – having the IME be conducted by a rheumatologist – would be to ignore the fact that the arbitrary and capricious standard focuses on the process, not the outcome. Relying on an IME performed by the most qualified doctor available, even when those qualifications are not optimal, does not constitute acting in an arbitrary and capricious manner.[9]

_____

[9] To the extent that plaintiff implies that utilization of a nurse, rather than a doctor, to conduct the claimant's file review and render a decision is per se arbitrary and capricious, such argument has been considered and rejected. *Shields v. Matrix Absence Management, Inc.*, 2008 WL 4443118, 7 (E.D. Wis. 2008); *see Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1038 (7th Cir. 2005) (upholding insurer's decision, even though a nurse conducted the final file review and was the final decision-maker as to whether the claimant was entitled to benefits).

**D.     Repudiation of Prior Decision Regarding Plaintiff's Disability**

Plaintiff claims that Matrix's denial of "any occupation" benefits amounted to a repudiation of its earlier decision granting her twenty-four months of "own occupation" benefits. She cites to several cases in support of her contention that such repudiation may not occur without evidence of improvement in the claimant's condition. Unfortunately for plaintiff, the cases to which she cites are highly distinguishable from the instant case.

Plaintiff cites *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589-90, (8th Cir. 2002), *Leger v. Tribune Company Long Term Disability Plan*, 557 F.3d 823, 833 (7th Cir. 2009), and *Kramer v. Paul Revere Life Ins. Co.*, 2009 WL 928573, 5-8 (6th Cir. 2009) as support for her argument that Matrix could not repudiate its original disability finding without some evidence of improvement in her medical condition. However, each of the above cases involved claimants who were already receiving a certain type of disability benefit, and whose disability benefits were terminated because the insurers essentially changed their minds as to the disabling nature of the claimants' conditions. That is very different from the facts in the instant case. In the instant case, Matrix did not terminate Burris's "own occupation" benefits. Those benefits naturally expired at the end of twenty-four months. For Burris to continue receiving benefits, she would have had to demonstrate that she qualified for "any occupation" benefits. Matrix determined that she did not meet her burden of proving that she met the more stringent requirements necessary in order to qualify

-15-

for "any occupation" benefits. Unlike the cases cited by plaintiff, Matrix did not grant Burris "any occupation" benefits, and then later terminate them without any new medical evidence; nor did Matrix terminate Burris's "own occupation" benefits.[10] Accordingly, plaintiff's argument that Matrix's "repudiation" of her benefits – without evidence of medical improvement – was arbitrary and capricious is without merit, as no such repudiation occurred.

### E.  Rationale for Denial of Benefits

According to the SPD, disability must be established by "objective medical evidence" ("OME"). The SPD defines OME as:

> A measurable independently observably [sic] abnormality which is evidenced by one or more standard medical diagnostic procedures including tests, clinical examinations or procedures that support the presence of a disability or indicate a functional limitation. Not all tests or test results meet the criteria for Objective Medical Evidence. Self reported symptoms are not considered objective and do not establish eligibility for benefits under this Plan.

(AHC 0027).

Cases involving fibromyalgia inevitably always come back to the subjective nature of the affliction. The Seventh Circuit has described fibromyalgia as follows:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and - the only symptom that discriminates between it and other diseases of a rheumatic character - multiple

---

[10] There is in fact evidence in the record to suggest that upon closer review of Burris's file, Matrix suspected that she did not qualify for "own occupation" benefits. *See* (Stip. Facts ¶¶ 19, 22). Despite that suspicion, Matrix did not attempt to terminate Burris's "own occupation" benefits.

-16-

> tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). The record evidence shows that Burris was diagnosed – by Dr. Hinkle, utilizing the 18-point test – with fibromyalgia. This is generally considered OME. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir.2003); *Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006).

Dr. Goodman, however, in conducting his IME stated:

> The examinee's condition is medically unexplained. There is no objective medical evidence of any pathophysiological or structural injury, defect, or derangement responsible for her condition. The suggestion that she has "tendinitis," "fibromyalgia," and "chronic fatigue syndrome" are merely speculative and without scientific foundation. These diagnoses are controversial and cannot be objectively verified.

(Stip. Facts ¶ 38). Dr. Goodman's position is categorically wrong, at least in a legal sense. As previously stated, under controlling precedent, the 18-point test is OME, and thus a diagnosis of fibromyalgia made utilizing said test is neither "speculative," "without scientific foundation," nor "not objectively verified." Further, Dr. Goodman's position regarding tendinitis is similarly unfounded. Tendinitis, particularly deQuervain's, is frequently diagnosed using medical examinations such as the "Finkelstein test".[11] In fact, plaintiff argues that "Dr. Hinkle made the tendinitis

---

[11] *See* http://www.webmd.com/rheumatoid-arthritis/de-quervains-disease. The Finkelstein test is done by having the patient form a fist with the thumb on the inside, then having the patient bend the wrist outward toward the little finger. Pain on the thumb side of the wrist is highly indicative of deQuervain's. *See* http://arthritis.webmd.com/tc/de-quervains-disease-topic-overview.

Case 2:08-cv-00322-JPS   Filed 03/18/10   Page 17 of 34   Document 42

diagnosis after performing a 'Finkelstein test' for deQuervain's Tenosynovitis." (Pl. Br. Supp. Mot. S.J. at 5). Unfortunately, plaintiff does not cite to any record evidence in support of this proposition. It is of little consequence, however, for the court is not attempting to determine whether Burris in fact qualifies for "any occupation" disability benefits, but rather whether the denial of those benefits was arbitrary and capricious. The fact that Dr. Goodman maintains that tendinitis cannot be objectively diagnosed, and that it is a "speculative" condition, means that his rejection of Dr. Hinkle's diagnosis would have always been arbitrary and capricious, regardless of whether Burris was in fact diagnosed with the Finkelstein test or not.

Dr. Goodman's categorical, and unfounded, rejection of fibromyalgia and tendinitis as conditions that could qualify an individual for "any occupation" benefits, eviscerates the credibility of his IME report. This is especially true given the extent to which that rejection appears to have informed his ultimate conclusion. Thus, Matrix's denial of benefits to not be arbitrary and capricious, it will have to have been premised on something other than Dr. Goodman's report, for Dr. Goodman's report was rooted in a falsity.

In rejecting Burris's claim, Matrix also relied on the opinion of Marvin Mitchell, a registered nurse who reviewed Burris's file. Mitchell's elucidations as to Burris's conditions are nearly as spurious as Dr. Goodman's. In its final denial letter, Matrix explained: "Mitchell note[d] that Dr. Hinkle [was] questioned to solicit his rationale for a diagnosis of fibromyalgia, and he offer[ed] trigger points, which, per Mitchell are

-18-

not definitive." (Stip. Facts ¶ 45). Of course, in a medical sense, testing positive for 11 of the 18 trigger points does not definitively mean that a patient has fibromyalgia. However, in a legal sense, testing positive for 11 of the 18 trigger points is OME of a diagnosis of fibromyalgia. Unless there is some other form of OME that calls the 18-point test into question, then, in a legal sense, a patient who tests positive for 11 of the 18 trigger points definitively has fibromyalgia.

However, the trigger point test is OME of the diagnosis of fibromyalgia, not that a certain patient's fibromyalgia constitutes a disability. *See Sarchet*, 78 F.3d at 306; *Hawkins*, 326 F.3d at 919. It is in this vein that "Mitchell point[ed] out that fibromyalgia is not a presumptive disabling condition." (Stip. Facts ¶ 45). Similarly, Matrix stated that "[f]ibromyalgia that is intractable to any treatment is not an expected outcome." (Id.). These assertions are very similar to the assertions made by Dr. Chou in *Hawkins*, 326 F.3d 914 – assertions which were roundly rejected by the Seventh Circuit.

Hawkins claimed disability due to fibromyalgia, and his LTD plan denied him benefits, relying substantially on the opinion of its medical consultant, Dr. Chou. *Id.* at 916. Dr. Chou opined that "the majority of individuals with fibromyalgia are able to work" and "[t]he diagnosis of fibromyalgia does not, in and of itself, produce permanent impairment." *Id.* at 918. Of these assertions by Dr. Chou, Judge Posner wrote: "The fact that the majority of individuals suffering from fibromyalgia can work is the weakest possible evidence that Hawkins can, especially since the size of the

majority is not indicated; it could be 50.00001 percent." *Id.* As to the second assertion, Judge Posner countered that it essentially said nothing about Hawkins actual condition. *Id.*[12]

Following Judge Posner's rationale, the court must find that the assertion that "fibromyalgia is not a presumptive disabling condition" is a very weak rationale for holding that Burris's fibromyalgia is not a disabling condition. Indeed, saying that fibromyalgia is not a "presumptive disabling condition" is simply another way of saying "the majority of individuals with fibromyalgia are able to work." Similarly, the fact that "fibromyalgia that is intractable to any treatment is not an expected outcome" is irrelevant to whether Burris's fibromyalgia is disabling. Indeed, even if her fibromyalgia was susceptible to treatment, nothing about that would mean that such treatment would render her able to work.

Though Matrix failed to evince any legitimate rationale for questioning Dr. Hinkle's diagnosis of Burris, and though Matrix failed to evince any legitimate rationale for rejecting Dr. Hinkle's opinion as to the disabling nature of Burris's condition, the fact remains that the burden was on Burris to prove that she is disabled. The only two portions of Matrix's denial letter that are of any merit hit on this very point. Matrix wrote: "[Mitchell] states: 'Even assuming the accuracy of the diagnosis, especially refuted by the IME, the primary treating physician does not

---

[12] Judge Posner went on to say that "the gravest problem with Dr. Chou's report [was] the weight he place[d] on the difference between subjective and objective evidence of pain," and that Dr. Chou appeared to believe that because fibromyalgia is "subjective" it can never be totally disabling. *Hawkins*, 326 F.3d at 919. As previously described, Dr. Goodman's report in the instant case evidences the exact same "grave problem."

provide insight as to what about these conditions precludes a return to work." (Stip. Facts ¶ 45). Matrix also wrote: "There is no physical exam or X-ray evidence of disabling osteoarthritis." (Id.). These two rationales could indeed be legitimate reasons for rejecting Burris's claim. For even if Dr. Goodman's report is ignored, and even if many of Mitchell's comments are ignored, the fact remains that the burden is not on Matrix to refute Burris's claim, but rather the burden is on Burris to prove her claim. Additionally, the burden is not to prove that she has the conditions that she claims, but rather to prove that those conditions prevent her from engaging in any occupation for which she is suited by training, education, or experience.

There appears to be no issue with the second "legitimate" rationale, for plaintiff does not claim that she did submit physical exam results or X-ray evidence of disabling osteoarthritis. However, there is at least some problem with the first "legitimate" rationale. The problem is that Dr. Hinkle, Burris's primary treating physician, did provide insight as to what about Burris's conditions precluded a return to work. Dr. Hinkle informed Matrix that due to her conditions, Burris had the following limitations: "no repetitive or forceful use of hands, no lifting greater than 10 pounds on any occasion, and no standing or walking greater than 2 hours a day with 1 hour intermittent rest." (Stip. Facts ¶ 27). Dr. Hinkle then clarified that "repetitive" meant "constant use for more than 1/4 hour," "forceful" meant "gripping weight of [more than] 10 pounds," and that "standing or walking [more than] two hours per day" means "throughout." (Id. ¶ 28). Thus, Dr. Hinkle did give insights as to how

-21-

Burris's conditions inhibit her ability to work. What Mitchell most likely meant when he stated that Dr. Hinkle gave no such insights was that he, Mitchell, did not find the basis for these insights to be satisfactory. Undoubtedly, Mitchell's point was that these insights were based on Dr. Hinkle's physical examination of Burris as well as Burris's responses to Dr. Hinkle's questions, rather than being based on laboratory tests. However, neither Mitchell nor Matrix proffered any evidence to counter Dr. Hinkle's findings, nor did they offer valid justifications for discounting his findings. Additionally, neither Mitchell, nor Dr. Goodman, nor Matrix, offered any elucidation or guidance as to what types of tests or evidence would be considered sufficient evidence to support the limitations opined by Dr. Hinkle.

## F.    Consideration of the Factors in the Aggregate

Now that the court has examined each of the various relevant factors in isolation, the court will consider them in the aggregate to determine if they weigh in favor of plaintiff or defendant. The factors that weigh in favor of finding the denial to be arbitrary and capricious are: the fact that Matrix required Burris to apply for Social Security benefits, but then gave no weight to the fact that she was awarded such benefits,[13] and the rationale given by Matrix for disregarding Dr. Hinkle's findings. The factors weighing in favor of finding that the denial was not arbitrary and capricious is the fact that in its denial Matrix stated that, even assuming Dr. Hinkle's

---

[13] As previously explained, the fact that there is no apparent conflict of interest in this case negates the weight of this factor to some extent, but the paucity of explanation given by Matrix for ignoring Burris's award conversely bolsters the weight of this factor to some extent.

diagnosis was correct, plaintiff simply has not presented sufficient evidence of disability.

In *Shields v. Matrix Absence Management, Inc.*,[14] 2008 WL 4443118 (E.D. Wis. 2008) this court remanded an "any occupation" benefits denial by Matrix, acting on behalf of the Aurora Health Care Long Term Disability Plan (the same defendant as this case), because of Matrix's categorical rejection of the claimant's fibromyalgia claim. *Id.* at 8-9. In that case, the entirety of Matrix's rationale for denying Shields disability claim was based on the report of a Dr. Ladin, who conducted an Independent Medical Record Review, and who essentially found that, because disability from fibromyalgia is unprovable through OME, Shields must not have been disabled. *Id.* at 9. Under Seventh Circuit case law, such a position is simply wrong, and the court thus found Matrix's decision to be arbitrary and capricious. The instant case is not as clear cut as *Shields*, because in the instant case Dr. Goodman conducted an in-person examination of Burris (whereas Dr. Ladin simply reviewed Shields's files), and because in the instant case Matrix at least references the fact that its decision is justified by the lack of OME of disability, regardless of the OME as to diagnosis.

At the end of the day though, Matrix's denial of Burris's claim is not significantly different from the denial of claims in either *Shields* or *Hawkins*. In the

---

[14] The plaintiff in *Shields* mistakenly named Matrix as a defendant. In such a case the only proper defendant is the plan itself, which in Shields was Aurora Health Care Long Term Disability Plan. In the court's order it terminated Matrix as a party; however, the name of the case at that juncture still appears as *Shields v. Matrix*.

-23-

instant case, Matrix disregarded Burris's social security award without any real explanation as to why it was doing so – other than to say that Social Security looks at different factors than the Plan does, which completely ignores the actual substantial overlap in factors that both are required to consider. Additionally, Matrix relied on the IME of a doctor who, though he conducted an in-person examination, based his assessment much more on the supposed "subjectiveness" of tendinitis, fibromyalgia, and chronic fatigue syndrome, rather than on his interaction with the patient.[15] Matrix also relied on the opinion of Nurse Mitchell, whose assertions were substantially similar to the assertions made in *Hawkins* by Dr. Chou, and discounted by Judge Posner. While it is true that the burden to prove disability (as distinguished from diagnosis) lies with the claimant, the fact is that Matrix appears to have been only interested in rejecting the evidence offered by Dr. Hinkle for being not what Matrix considers as OME. At no point did Matrix offer any guidance to claimant or Dr. Hinkle as to what evidence they could submit that Matrix would consider acceptable. It is arbitrary and capricious to say to a doctor: "provide OME of disability due to fibromyalgia, tendinitis, and chronic fatigue syndrome," but then to

---

[15] For example, Dr. Goodman noted that Burris offered "no evidence of symptom magnification or inappropriate pain behaviors." (Stip. Facts ¶ 38). However, in the same report he completely discounts her claims of tendinitis, fibromyalgia and chronic fatigue syndrome because "[t]hese diagnoses are controversial and cannot be objectively verified." (Id.). The only reason that it matters that they cannot be objectively verified is because of the danger of patients faking or exaggerating such conditions – something that he says there is no evidence that Burris is doing. He offers no rationalization of his position that she is not faking her symptoms, with his position that her symptoms should not be considered because they are the type of symptoms that someone could fake.

be unwilling to accept anything as OME of such.[16]  Thus, on the record evidence, and in accordance with *Shields* and *Hawkins*, the court finds that the Plan's denial of LTD "any occupation" benefits was arbitrary and capricious.

## IV.    REMAND

According to the court in *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, (7th Cir. 2003), where the administrator's decision was arbitrary and capricious, the court should seek to restore the status quo.  *Id.* at 776.  Thus, where the benefits are terminated without adequate procedures, the plaintiff is entitled to reinstatement of benefits. *Halpin v. W.W. Grainger*, 962 F.2d 685, 697 (7th Cir. 1992).   However, where the "administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the status quo and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place." *Hackett*, 315 F.3d at 776.

As previously explained, in the instant case, Burris's benefits were not terminated.   Her "own occupation" benefits expired, and she was denied "any occupation" benefits.  This court does not find that she is entitled to "any occupation" benefits; it merely finds that her denial of such was arbitrary and capricious.  She is entitled to having that denial reviewed, de novo, by Matrix in a non-arbitrary and

---

[16] In fact, the court has little doubt that if Matrix's nurse case managers were asked: "What is considered acceptable OME of disability due to fibromyalgia," the asking party would receive neither consistent nor useful answers.

capricious manner. Accordingly, the court shall remand this action for a redetermination of Burris's eligibility for "any occupation" LTD benefits.

## V. ATTORNEYS' FEES

Plaintiff asks that the court award her attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1) which states: "In any action under this subchapter . . . by a . . . beneficiary . . . the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Id. District courts are to entertain a "modest presumption" that prevailing parties are entitled to a reasonable attorneys' fee. *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir. 2000). The test for determining whether an award of fees and costs is appropriate under § 1132(g)(1) is whether the losing party's position was "substantially justified and taken in good faith," that is, did the losing party's position have a "solid basis." *Production and Maintenance Employees' Local 504 v. Roadmaster Corp.* 954 F.2d 1397, 1405 (7th Cir. 1992).

The court finds that the Plan's position was neither substantially justified, nor taken in good faith, and that it did not have a solid basis. In *Shields v. Matrix*, this court articulated very clearly, to this very defendant and defense counsel, that a denial of benefits based on the notion that disability due to fibromyalgia is unprovable is an arbitrary and capricious denial. 20008 WL 4443118, at 9. Though Matrix's rationale for denying benefits in the instant case was slightly less egregious than in *Shields*, ultimately Matrix still relied on Dr. Goodman's and Nurse Mitchell's

-26-

opinions that disability due to fibromyalgia simply cannot be proven, thus Burris's claim should be denied. The court did not grant attorneys' fees in *Shields* because the court found that, given the highly deferential standard of review, the defendant was not unreasonable to think it could prevail. However, such rationale no longer holds true. Given the prior ruling in *Shields*, this defendant and defense counsel could not have a solid basis for thinking they would prevail on a case so factually similar to *Shields.* Thus, under the "substantially-justified/good-faith and solid basis" test, plaintiff is entitled to attorneys' fees.

However – though neither of the parties to the instant case raise or address the matter – the court notes that the Seventh Circuit has strongly suggested that an award of remand never entitles a claimant to attorneys' fees at that juncture of the proceedings. *See Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 479 (7th Cir. 1998) (plaintiff who secures remand "is not a prevailing party in the truest sense of the term."); *Tate v. Long Term Disability Plan for Salaried Employees of Champion Intern. Corp. No. 506*, 545 F.3d 555, 564 (7th Cir. 2008) (same); *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 835 n.9 (7th Cir. 2009) (same). Unfortunately, while the Court of Appeals has suggested that no claimant who is awarded remand should also be awarded attorneys' fees at that juncture, the court has never actually expressly held such.

In *Quinn*, the court stated that the claimant, who had been granted remand, was "not a prevailing party in the truest sense of the term" because she was not

Case 2:08-cv-00322-JPS   Filed 03/18/10   Page 27 of 34   Document 42

actually awarded disability benefits, but rather a non-arbitrary and capricious review of her denial. 161 F.3d at 478-79. However, the court then explained that while the defendant's denial of benefits was arbitrary and capricious, its position in the case was not necessarily "totally lacking in justification nor [was] there any evidence that [the defendant] acted in bad faith." *Id.* at 479. Thus, the "substantially-justified/good-faith and solid basis" test was not met. *Quinn* offers no insight as to whether a claimant who is awarded remand may at that juncture recover attorneys' fees when the defendant's position opposing remand was not substantially justified, was not taken in good faith, and did not have a solid basis.

Further, while the fact that a party that is awarded remand is not a prevailing party in "the truest sense" of the term may be correct, that fact standing alone ought not preclude such a party from receiving an award of attorneys' fees. If the defendant opposing remand did so without a solid basis for doing so, then the defendant has caused the claimant to incur expenses that should never have been incurred. At the end of the day, the question should not be whether the defendant had a good faith basis for denying benefits. An award of attorneys' fees compensates the claimant for the costs incurred not on account of the denial of benefits per se, but by the litigation in federal court as to whether that denial was arbitrary and capricious. If defense counsel, upon examining the record, should have known that there was not substantial justification for opposing remand, then defense counsel should have appropriately stipulated to a remand. To not do so,

-28-

and therefore force claimant to incur the costs of litigation, is the wrong that an award of attorneys' fees ameliorates. The question of whether a claimant is ultimately awarded benefits is irrelevant to whether the original denial and review were arbitrary and capricious. Similarly, the question of whether a claimant is ultimately awarded benefits is irrelevant to whether defense counsel forced the claimant to incur unnecessary costs by opposing remand when defense counsel did not have a solid legal basis for doing so. Thus, this court maintains that an award of attorneys' fees at the remand juncture should solely turn on the reasonableness of the defense's opposition to remand; it should not matter at all what happens after remand is granted.

Following *Quinn*, the court of appeals, in *Tate*, 545 F.3d 555, affirmed the district court's remand of a claimant's case because it found that the defendant's denial of benefits was arbitrary and capricious. *Id.* at 557. The district court had also denied the claimant attorneys' fees because the claimant had only been granted remand (thus was not yet a prevailing party according to *Quinn*), and because "the district court found that the record did not suggest that [the claimant's] benefits were terminated in bad faith or that the Plan's position was not substantially justified." *Id.* 564. On appeal, the claimant urged the court of appeals to reconsider *Quinn*, as to the issue of whether a claimant awarded remand may be entitled to attorneys' fees. *Id.* However, that issue was not properly before the court of appeals, because the court of appeals did not disagree with the district court's holding that the defendant

had not acted in bad faith, and that the defendant's position was not without substantial justification. Thus, as in *Quinn*, the court of appeals had no reason to consider whether a claimant who is awarded remand may at that juncture recover attorneys' fees when the defendant's position opposing remand was not substantially justified, was not taken in good faith, and did not have a solid basis.

In *Leger*, the court of appeals only addressed the question of attorneys' fees in a footnote in which it stated:

> Because we have not ordered Ms. Leger's benefits reinstated, her request for attorneys' fees is premature. We previously have held that "a claimant who is awarded a remand in an ERISA case generally is not a 'prevailing party' in the 'truest sense of the term,'" *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. # 506*, 545 F.3d 555, 564 (7th Cir.2008) (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478-79 (7th Cir.1998)), and Ms. Leger has not argued that attorneys' fees should be awarded in the absence of an order for reinstatement of benefits.

557 F.3d at 835, n.9. The first portion of the above stanza seems to indicate that *Tate* and *Quinn* forbade the granting of attorneys' fees to any ERISA claimant at the remand juncture – regardless of how baseless the defense's position was. However, the second portion of the stanza makes it clear that Leger did not argue that she should be entitled to attorneys' fees regardless of whether her benefits were reinstated. Thus, like *Quinn* and *Tate*, *Leger* did not squarely place the relevant question before the court of appeals.

Thus, it would appear that the court of appeals has not held – in a case where the defendant's position was not substantially justified – that a claimant that is

-30-

awarded remand may not be awarded attorneys' fees at that juncture. Though the language of *Quinn*, *Tate*, and *Leger* suggests that a claimant should never be awarded attorneys' fees at the remand juncture, the fact is that the relevant issue simply was not squarely before the court of appeals in any of those three cases. The issue was irrelevant because the "substantially-justified/good-faith and solid basis" test was either not met or not addressed. Thus, even if a claimant who is awarded remand could also be awarded attorneys' fees, the claimants in *Quinn*, *Tate*, and *Leger* would have nonetheless not been entitled to such fees.[17] The instant case is different. In the instant case the above issue is ripe and squarely at issue.

To be sure, some district courts have treated *Quinn*, *Tate*, and *Leger* as requiring that no ERISA claimant may be awarded attorneys' fees at the remand stage of proceedings. *See Ravesloot v. Administrative Committee of Baxter Intern., Inc.*, 2004 WL 1427101, 7 (N.D. Ill. June 24, 2004); *Carugati v. Long Term Disability Plan for Salaried Employees*, 2002 WL 441479, 9-10 (N.D. Ill. March 21, 2002). However, courts have also been willing to criticize the *Quinn* line of cases, and to question why the Seventh Circuit treats ERISA remands differently than Social Security remands (in which the claimant that earns remand may seek attorney fees under the Equal Access to Justice Act). *See Jacobson v. SLM Corp. Welfare Ben. Plan*, 669 F. Supp. 2d 940, 942-44 (S.D. Ind. Nov. 10, 2009). Indeed, in *Jacobson*,

---

[17] Perhaps the claimant in *Leger* would have been entitled to such fees, but as she did not argue that she would be so entitled (absent reinstatement of benefits) the issue was neither presented nor resolved.

Judge David Hamilton, writing as the Chief Judge of the District Court for the Southern District of Indiana, strongly criticized the notion that no ERISA claimant could be awarded attorneys' fees on remand. However, ultimately he found that the *Quinn* line of cases held as much, and thus he denied attorneys' fees (at that juncture) to a claimant he believed was entitled to attorneys' fees. *Id.* at 944 ("Because the court's hands are tied by clear Seventh Circuit language and precedent, Jacobson's petition for attorney fees must be denied with the hope that the appellate court might soon revisit the reasoning behind *Quinn*, *Tate*, and *Lege*r, and impose consistency between private and public disability benefits on this point. If this court were free to exercise its discretion, it would act consistently with the EAJA and the reasoning of the District of Massachusetts in *Colby*, and would grant Jacobson's petition.").

Judge Hamilton's opinion in *Jacobson* was issued on November 9, 2009. Judge Hamilton was confirmed to the Seventh Circuit Court of Appeals on November 19, 2009. On November 30, 2009, the claimant in *Jacobson* filed a notice of appeal as to the denial of attorneys' fees. Thus, though this court is not convinced that *Quinn*, *Tate*, and *Leger* necessarily forbade a district court from granting a claimant attorneys' fees at the remand stage of proceedings, the most prudent course of action seems to be to act as though they do forbade such an award. It is obviously an area of law that requires further clarification. However, Judge Hamilton's well articulated position in *Jacobson*, combined with the fact that *Jacobson* is now on

appeal to the Seventh Circuit, ensures that the court of appeals will likely[18] have the relevant issue squarely before it and, therefore, will have the opportunity to definitively resolve the issue. Therefore, though claimant should receive attorneys' fees – since the attorneys' fees she incurred were directly the result of the defense taking an unjustified position – the court will deny her attorneys' fees, at this juncture, out of deference to the court of appeals.

## CONCLUSION

In denying Burris's claim, Matrix relied on statements by Dr. Goodman and Nurse Mitchell that were inaccurate (at least in a legal sense) in regards to the possibility of demonstrating fibromyalgia through OME and the possibility of demonstrating disability from fibromyalgia through OME. Matrix also failed to offer adequate reasoning for its rejection of Dr. Hinkle's finding as to diagnosis, and more importantly as to functional limitations. Though Matrix offered a small amount of legitimate justification for its denial, the court finds, through weighing the various factors it must consider, that Matrix's denial of "any occupation" LTD benefits was arbitrary and capricious. As such, the court remands the matter so that Matrix can reconsider Burris's application, and render a decision that is neither arbitrary nor capricious. The court further finds that defendant's position was not substantially justified and did not have a solid basis and, therefore, claimant is entitled to an

---

[18] On February 1, 2010, the court of appeals suspended briefing in the *Jacobson* case pursuant to Circuit Rule 33. Such a suspension is often initiated in order to allow the parties an opportunity to discuss settlement. Obviously, if the parties do settle, then the law will remain unclear and the issue unresolved.

Case 2:08-cv-00322-JPS   Filed 03/18/10   Page 33 of 34   Document 42

award of attorneys' fees.  However, in deference to the fact that relevant Seventh Circuit case law strongly suggests – though does not expressly hold – that such an award is inappropriate at this juncture, the court finds itself constrained to withhold an award of attorneys' fees to Burris.

Accordingly,

**IT IS ORDERED** that plaintiff's Motion for Summary Judgment (Docket #30) be and the same is hereby **GRANTED** and this action is **REMANDED** to the claims administrator for a redetermination of plaintiff's eligibility for benefits; and

**IT IS FURTHER ORDERED** that defendant's Motion for Summary Judgment (Docket #33) be and the same is hereby **DENIED**.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 18th day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge